UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL ACTION |
| ) | NO. 04-10058-MEL |
| CHRISTOPHER LOGRASSO ) | |
| ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR IMPOSITION OF A SENTENCE BELOW THE APPLICABLE GUIDELINE**

I.  A.  <u>Grounds for Departure:  General Background</u>

As the applicable Policy Statement for U.S.S.G. sec. 5K2.0 clearly states:

Under 18 U.S.C. sec. 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists [a]... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described'...The controlling decision as to whether and to what extent departure is warranted can only be made by the courts...Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission.  Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing court.  Similarly, the court may depart from the guidelines,

even though the reason for departure is taken into consideration in the guidelines...if the court determines that, in light of unusual circumstance, the guideline level attached to that factor is inadequate. In upholding the district judge's downward departure against a government appeal, the court in United States v. Lara, 905 F.2d 599, 604 (2nd Cir. 1990) opined as follows:

> ...The legislative history [of the guidelines] reflects that it was not Congress' aim to straight jacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines glass bubble, and preventing it from exercising discretion, flexibility or independent judgment...[T]he sentencing judge has an obligation to consider all relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case...Congress did not limit what a court may determine under Sec. 3553(b) to have been inadequately considered by the Commission. Rather, this provision was left open to provide flexibility necessary to assure adequate consideration of circumstances that might justify a sentence outside the guidelines.

The defendant submits that the instant case is one which is appropriate for this court to depart downward from the applicable guideline. See United States v. Rivera, 994 F.2d (1st Cir. 1993). United States v. Gifford, 17 F.3d 462 (1st Cir. 1994).

The applicable guidelines in the instant case are those contained in the Guidelines Manual issued November 1, 2002. The application of guidelines amendments effective after January 23, 2003, the date of the last offense of conviction would violate the Ex Post Facto Clause of the Constitution. See United States Constitution, art. I, Cl 3. In Miller v. Florida, 482 U.S. 423 (1987), Florida's sentencing guidelines at the time of the crime provided a lower presumptive sentencing range than the revised guidelines at the time of sentencing. The trial court imposed the revised sentencing guidelines in sentencing the defendant. The Court held that "[t]he law at issue in this case...makes more onerous the punishment for crimes committed before its enactment...Accordingly, we find that Florida's revised guidelines law...is void as applied to the petitioner, whose crimes occurred before the law's effective date." Id. at 435-36. See United States v. Paskow, 11 F.3d 873, 877 (9th Cir. 1993), citing Miller v. Florida, 482 U.S. at 429 for a two-pronged test which has developed to determine whether the application of a penal law violates the ex post facto clause. "First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it...These two factors must be assessed in connection with the date of the defendant's offense, not his conviction or sentencing." Accord, United States v. Johns, 5 F.3d 1267, 1276 (9th Cir. 1993) (Where Commission enacted a guideline which took a goodly measure of discretion away from district judges regarding a downward departure the

3

effect was to make the punishment for the crime more burdensome. "The removal of that discretion constituted an ex post facto violation because removal of the possibility of a lesser sentence operates to the defendant's detriment in the sense that the standard of punishment adopted by the new statute is more onerous then that of the old.")

B.   The Defendant[1]

Christopher LoGrasso was born on July 6, 1979. He never knew his birth parents and was adopted as an infant by Salvatore and Mary LoGrasso. The defendant's adoptive mother passed away from cancer when the defendant was four years old. The defendant has no siblings.

The defendant's father initially brought him for therapy at age five, which began an intermittent history of psychotherapy into the defendant's teen years. According to the defendant's father, he had been seen by approximately twenty (20) different counselors during his childhood.

Shortly after the death of the defendant's mother, due to his father's lack of parenting skills, he went to live with a maternal aunt and uncle. Early therapy records indicate that at age 6½ the defendant was living with his aunt and uncle during the school week and with his father on weekends. The defendant became close with his uncle. When the defendant was approximately 9 years old, his uncle committed suicide. Early psychological testing revealed that the defendant was diagnosed with a learning disability,

---

[1] The defendant's personal history is taken from the PreSentence Report and the report of his therapist, Georgia Green, LICSW.

4

short-term memory loss and a fear of rejection by parental figures. Based upon doctors' recommendations encouraging a more stable living situation, the defendant returned to his father full-time. The defendant was also diagnosed with Attention Deficit Disorder. As a child the defendant suffered from social anxiety and had trouble socializing with other children in his neighborhood and at school.

The defendant's relationship with his father worsened as the defendant entered his teen years. At age 13 the defendant had his only court involvement prior to the instant case as a result a series of juvenile larceny complaints. The defendant successfully completed his probationary period in those matters. At age 15 the defendant was the subject of CHINS (Child In Need of Services) petition filed by the Wakefield School Department. The Department of Social Services became involved and the defendant was assigned to the custody of a foster father, Doug Webber, with whom the defendant resided from January 31, 1994 – May 20, 1994. The defendant was then reunited with his father. The defendant continues to maintain a relationship with Mr. Webber.

The defendant dropped out of high school in the 11th grade. The defendant's mechanical ability led him to an interest in computers with which he developed significant self-taught skills. In 1999, the defendant's father moved out of the family home to live with his wife. The defendant continues to reside in the family home. In the few years prior to entering

5

therapy on January 30, 2003, the defendant had demonstrated little motivation for self-care, including medical care, compounded by a lack of health insurance. In addition to his obesity (the defendant stands at 5'11 and weighs approximately 340 lbs.), the defendant has been diagnosed with sleep apnea and enlarged adenoids and tonsils, all of which contributed to his chronic sleep disorder, lethargy and increased depressive symptomology. These physical problems have contributed to the defendant's inability to maintain a steady job. However, from 1997 to date, the defendant has operated his own business from home, Prostar Dynamics, a company which auctions computer equipment on E-Bay, generating a gross weekly income of approximately $400.00 until the defendant began winding down his business in anticipation of this sentencing.

The defendant has described the January 23, 2003 visit by the FBI to his residence as a "wake up call", an event which made him realize that he needed to make basic lifestyle changes. On January 30, 2003, the defendant presented at the MGH Chelsea Health Care Center for a mental health intake. This was the defendant's first self-motivated attempt to improve his mental health and lifestyle. The defendant reports that current mental health treatment has allowed him to "pull his life together". He had been able to make his business more successful, and more importantly, he has enjoyed his first successful interpersonal relationship. The defendant has become engaged to Lisa Manghetti. Ms. Manghetti, the mother of two young

children is fully aware of the defendant's legal situation.[2] The defendant's therapist, Ms. Green has reported the following:

> I recommended that Mr. LoGrasso participate in a psychopharmacology evaluation, and to have a physical examination. He has seen Bayoan Martinez-Cruz, MD on three occasions and has met once with a nutritionist. On April 23, 2004 he met with Gail Leslie, RN, CNS for a psychopharmacology evaluation. He was begun on Prozac, 20 mg. Mr. LoGrasso has seen me for 29 sessions since April, 2003 to present.[3] Mr. LoGrasso is an active participant in therapy and appears motivated to understanding both the meaning to him of his use of pornography, as well as, the relevance of his past history to the present. He has responded well to Prozac and reports increasing energy and motivation. His appearance has also improved, as he appears to pay more attention to his grooming and to his personal appearance.
>
> It is my opinion that Mr. LoGrasso has not dealt with the profound losses in his life and that he has suffered from depression for some time. This and his learning difficulties have left him with limited opportunities for achievement, and have contributed at least in part to his current legal situation. It is my hope that he will remain in treatment to deal with the emotional, medical, and occupational issues in his life, and to become the productive adult that he has the capacity to be...

Clearly, Ms. Green's clinical findings support the defendant's awareness that providing pornography to others via his considerable computer skill had been, prior to January 23, 2003, the source of gratification amid what had been a depressive and lonely lifestyle.

---

[2] See ¶2 of the PSR. On January 7, 2004 after conducting a colloquy with Ms. Manghetti under oath, Magistrate Judge Cohen granted the defendant's motion to modify the defendant's conditions of release to allow the defendant to have contact, with some limitations, with Ms. Manghetti's minor children.

[3] Ms. Green's report was drafted on June 1, 2004.

7

In addition to acting upon his sincere desire for treatment by promptly and voluntarily undergoing treatment and radically changing his life-style by establishing and re-establishing meaningful and personal relationships, the defendant provided cooperation to the Government in its undercover investigation of individuals who use computers to transmit and receive child pornography. On February 6, 2004, without any promises or offers of sentencing assistance, and with no real expectation of such assistance, the defendant and undersigned counsel met with F.B.I. Special Agent David George of the Innocent Images operation for the express purpose of cooperating in any way that the defendant could. Special Agent George was investigating two specific individuals, Brian Duffy and Eric Malignaro. The defendant had been friendly with Duffy in high school and had coincidentally been contacted by Duffy in December, 2003. Special Agent George believed that the defendant's cooperation provided an unusual cooperation circumstance in that the defendant had the opportunity to develop evidence with regard to someone who the defendant actually knew. At this initial meeting, the defendant agreed to wear a body wire/transmitter and consented to the electronic monitoring of his telephone calls in furtherance of the investigation. The defendant then, at some potential personal risk, became an FBI confidential informant/cooperating witness and met with Duffy while wearing a body wire on two occasions and produced 3-4 hours of telephone tapes with Duffy. See, the terms of the defendant's assistance agreement,

8

marked "C", submitted herewith and incorporated herein by reference. During subsequent meetings with Special Agent George, George expressed to the defendant that a goal of the investigation was to try to understand the motivations of those who engage in this type of crime. During these meetings the defendant was able to provide general assistance, i.e., information concerning the problems which the Innocent Images operation should expect to encounter with the recent advent of wireless technologies and certain file sharing software (e.g. "WIF", Bear Share, Direct Connect).

Finally, on April 9, 2004, the defendant submitted his Registration with the Commonwealth of Massachusetts Sex Offender Registry Board. See "D", submitted herewith.

II.  SPECIFIC GROUNDS FOR DEPARTURE

A.  The applicable U.S.S.G. Section 5K2.13 provides that a sentencing court may sentence below the range of sentences prescribed for a nonviolent offense to the extent that the reduced mental capacity of a defendant not resulting from the voluntary use of drugs or alcohol contributed to the commission of the offense, provided that the criminal history of the defendant does not indicate a need for incarceration to protect the public. The defendant meets these criteria.

As evidenced by the report of Georgia Green, the defendant has suffered from depression for most of his life. A psychological evaluation by John F. Cusack, Ph.D, undertaken at the request of the PreTrial Services

Office (PSR, ¶87) concluded that the defendant's reported symptoms "are suggestive of a chronic, longstanding depression that at times intensifies as well as anxiety" ...that "appear to be related to his past during which he experienced considerable emotional abuse and neglect, significant loss, attachment problems, significant learning and behavioral difficulties, foster and specialized school placements." As part of his assessment, Dr. Cusack administered the Millon Clinical Multiaxial Inventory – III (MCMI-III) to the defendant with results indicating feelings which may interfere with his capacity to cope satisfactorily. The defendant's profile reflects an intense conflict between a desire to withdraw from interpersonal relationships and fear of abandonment. The defendant wants the support of others but has learned to anticipate derogation and disillusionment. The defendant's sense of deflated self-worth and his expectation of failure and humiliation may constrain his emotion. At the conclusion of his assessment, Dr. Cusack's Axis I diagnosis was listed as Dysthymic Disorder.[4] Dr. Cusack ruled out

---

[4] The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed.)(DSM-IV) states that the essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least two years. Common symptoms of this disorder are overeating, insomnia, low energy or fatigue, low self-esteem, poor concentration and feelings of hopelessness. Other features are feelings of inadequacy, generalized loss of interest or pleasure, social withdrawal and decreased activity, effectiveness and productivity. According to the DSM IV, Dysthymic Disorder shares similar symptoms with Major Depressive Disorder. The DSM-IV questions whether drawing a distinction between depressive personality disorders and Dysthymic Disorder is at all useful.

Paraphilic Disorder.[5] The defendant's history and functioning prior to January 23, 2003 clearly support the diagnoses of Dr. Cusack and Ms. Green.

§5K2.13 is an encouraged departure. United States v. Shore, 143 F. Supp. 2d 74, 79 (D. Mass. 2001), citing Koon v. United States, 518 U.S. 81, 92-96 (1996) and United States v. McBroom, 124 F.3d 533, 538 (3rd Cir. 1997) ("The factors contained in subpart 5K2 are so-called 'encouraged factors.'"). "During the 1998 amendment cycle, the Commission broadened §5K2.13…The new standard, 'significantly reduced mental capacity', is… defined in the Application Note following §5K2.13 as, "significantly impaired ability to…control behavior that the defendant knows is wrongful'." United States v. Shore, supra at 80. As the McBroom Court clearly holds, there is a volitional prong to significantly reduced mental capacity which considers defects in the defendant's ability to control his own conduct, supra at 544-545. Furthermore, "section 5K2.13 does not require that reduced mental capacity be the 'but for' or 'sole' cause of the offense. The key words of the section are: 'a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense…' This means, as we interpret it, that, the reduced mental capacity of a defendant must have contributed to some extent to the commission of the offense." United States v. Lauzon, 938 F.2d 326, 331 (1st Cir. 1991). United States v. Shore, supra at 80. See, United States v. Sadolsky, 234 F.3d 938, 942 (6th

---

[5] According to the DSM-IV Paraphilic Disorders are sexual disorders, including pedophilia.

Cir. 2000) ("...§5K2.13 does not require a direct causal link between the significantly reduced mental capacity and the crime charged"); United States v. Cantu, 12 F.3d 1506, 1515 (9th Cir. 1993) ("other circuits are unanimous in holding that the disorders need only be a contributing cause, not a but-for cause or sole cause, of the offense"). United States v. Davis, 919 F.2d 1181, 1187 (6th Cir. 1990) (A downward departure is justifiable when the defendant commits a nonviolent offense while suffering from significantly reduced mental capacity).[6]

The defendant submits that the record in this case provides an ample factual basis to warrant this court in concluding that the defendant's distribution of pornography, including child pornography, was the source of gratification amid a depressive and lonely life-style, that he acted with significantly reduced mental capacity at the time the offense was committed, and that the reduced mental capacity contributed somewhat to the commission of the offense. See U.S. v. Ribot, 97 F. Supp. 2d 74 (D. Mass. 1999). "Section 5K2.13 is intended to create lenity for those whose significantly reduced mental capacity cause them to commit the offense of conviction." United States v. McBroom, supra at 547-548. And, clearly, "desert" and "deterrence" tend to lose some of their relevance when applied to

---

[6] In United States v. McBroom, supra at 542, the court held that possession of child pornography is a non-violent offense. See United States v. Tanasi, 2003 WL 328303 (S.D.N.Y.) Downward departure ordered in a child pornography distribution case for diminished capacity where there was no evidence that the defendant was a predator.

those with reduced mental capacity. See, <u>United States v. Chatman</u>, 986 F.2d 1446 (D.C. Cir. 1996).

B.  "Ordinarily, presentence rehabilitation is not a permissible ground for departure because it can be factored adequately into the sentencing equation by an acceptance-of-responsibility credit...But a datum that is taken into account by a guideline nonetheless can form a basis for a departure if it is present to an exceptional degree' or 'makes the case different from the ordinary case where the factor is present.' <u>Koon</u>, 518 U.S. at 96... In an appropriate case, therefore, extraordinary presentence rehabilitation can ground a downward departure..." <u>United States v. Craven</u>, 239 F.3d 91, 99 (1st Cir. 2001). (<u>Craven</u> I). "[T]he touchstone of extraordinary rehabilitation is a fundamental change in attitude." <u>United States v. Craven</u>, 358 F.3d 11 (1st Cir. 2004). (<u>Craven</u> II).

The circumstances of the instant case are significantly unusual to justify departure and the record adequately documents the defendant's genuine acknowledgement of responsibility for his crimes and radical alteration of his lifestyle. This is a rare case where the defendant's rehabilitative efforts by far exceed those necessary for the basic "acceptance of responsibility" adjustment. Indeed, it is hard to imagine how the defendant could have accomplished more between the discovery of the crime and time of sentencing. At the present time the defendant is clearly on his way to enjoying, for the first time, a healthy and productive life, as evidenced

by the report of Georgia Green, marked "A", the letters of support from the defendant's father and stepmother, Salvatore and Carol LoGrasso, marked "E", the defendant's fiancée, Elisa Menghetti, marked "F", the defendant's former foster-father, Douglas K. Webber, marked "G" and a neighbor, Stephen L. Muse, marked "H". After the Government's discovery of the offense, the defendant promptly and voluntarily underwent extensive rehabilitation efforts which have resulted in considerable success. See United States v. Seethaler, 2000 WL 1373670 (N.D.N.Y. 2000), citing United States v. Core, 125 F.3d 74, 78-79 (2nd Cir. 1997) and United States v. Maier, 975 F.2d 944, 948 (2nd Cir. 1992) and contrast United States v. Barton, 76 F.3d 499 (2nd Cir. 1996). Both the Seethaler and Barton cases involved child pornography. Seethaler's rehabilitative efforts made real progress, i.e., he had made exceptional recovery from his sexual fetishism, had significantly reduced his depression, and had re-established himself in his family and his occupational pursuits, as compared with Barton, who, while seeking rehabilitation of his own volition, showed no objective indications of overcoming his condition. See also United States v. Kapitzke, 130 F.3d 820 (8th Cir. 1997) (Defendant convicted in child pornography case who entered into treatment immediately and showed significant progress might be entitled to a downward departure based upon extraordinary post offense rehabilitation. Whether the defendant is entitled to a downward departure is a fact based judgment that falls within the district court's sentencing

discretion). United States v. Jones, 158 F. 3d 492 (10th Cir. 1998) (Whether defendant's post-offense rehabilitation efforts leading to a change in attitude and conduct are exceptional falls squarely within the realm of the district court's "special competence"). United States v. Newlon, 212 F.3d 423 (8th Cir. 2000) (Where defendant exhibits sincere desire for treatment and treatment program leads to marked improvement in behavior and attitude, district court may depart on the basis of atypical rehabilitative efforts). United States v. Parella, 273 F. 2d 162 (D.Mass. 2003) (After successful treatment defendant had totally changed his life around and treatment made recidivism unlikely).

The defendant's cooperation with the government investigation as evidenced by "C", with no agreement by the government to file for a downward departure under U.S.S.G. § 5K.1.1 also shows acceptance of responsibility outside of the heartland of U.S.S.G. § 3E1.1

In the instant case, the defendant immediately admitted the conduct comprising the offense, and upon first opportunity, cooperated with the government as to his own role in the offense, willingly and actively cooperated in the investigation of others, and provided investigators with information to assist then generally in understanding the motivations of those engaged in this type crime and the problems they should expect to encounter with the advent of new technologies. In United States v. Truman, 304 F.4d 586 (6th Cir. 2002), the Court, citing United States v. Kaye, 140 F.3d

15

86 (2nd Cir. 1998), overruled the sentencing judge who believed that he lacked the discretion to depart downward for the defendant's assistance to the government which did not result in the investigation or prosecution of another individual absent a motion from the government to depart pursuant to U.S.S.G. § 5K1.1. The Truman court held that where the defendant had cooperated with DEA diversion investigators relative to exposing security breaches or revealing modus operandi that can be frustrated by prophylactic, measures to prevent crimes, "there is no good reason…to condition the exercise of judicial discretion on a government motion." Id. 591. A sentencing court is not precluded from departing downward on the basis of cooperation or assistance to the government which does not involve investigation or prosecution of another. The defendant's justification for departure falls outside the plain language of §5K.1.1 and is governed by §5K2.0, permitting the sentencing court to exercise its discretion to depart without a motion from the government. See United States v. Rothberg, 222 F.Supp.2d 1009 (N.D.Ill. 2002). United States v. Stoffberg, 782 F.Supp.2d 1092 (9th Cir. 1991). United States v. Khan, 920 F.2d 1100 (2nd Cir. 1990).

In this case, the defendant's efforts went far beyond a mere desire to aid the government. The defendant provided actual assistance which, in combination with his successful treatment efforts to date, demonstrates a genuine acknowledgement of responsibility for his crime and a radical alternation in his lifestyle. This court should find the defendant's

rehabilitative efforts are indeed atypical, and thus, warranting a downward departure. See United States v. Bradstreet, 207 F.3d 76, 82 (1st Cir. 2000). ("...[T]he Guidelines are not designed to eliminate all disparities in sentencing; rather their design is to eliminate 'unwarranted' disparities").

C.  A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure. United States v. Koon, supra, 518 U.S. at 111-12. In the instant case, the nature of the offense, in combination with other factors, i.e., the defendant's stature, demeanor and naiveté, increase his susceptibility to abuse. The defendant is a large man who is out of shape and has never before engaged in fighting conduct. He has been depressed for most of his life and has suffered from social anxiety since early childhood. In order to make an appropriate individualized sentencing determination, this court must take into account the realities of what this particular individual is likely to face in prison and the life skills at his disposal to deal with those realities. This Court would be warranted in granting the defendant a downward departure on this basis. See United States v. Rodriguez, 327 F.3d 52 (1st Cir. 2003). United States v. Parish, 308 F.2d 1025 (9th Cir. 2002).

D.  "Tragic personal background and family history" of a defendant provides a sentencing judge with the discretion to depart downward in an extraordinary case. United States v. Lopez, 938 F.2d 1293, 1297-98 (D.C. Cir. 1991), citing United States v. Deigart, 916 F.2d 917, 918-19 (4th Cir. 1990).

17

The profound losses in the defendant's life, his fractured family life as a child and adolescent, and his learning disabilities all contributed to his long term depression and social isolation, which in turn led to the distribution of pornography as a source of gratification in this lonely lifestyle. It would be truly difficult to imagine a more socially disadvantaged upbringing than that encountered by this defendant. In the extraordinary circumstances as documented in the defendant's history, this Court is warranted in granting the defendant a downward departure on this basis. See United States v. Vela, 927 F.2d 197. 199 (5th Cir. 1991) ("A defendant's family history...which causes the defendant to incur a mental or emotional condition that affects criminal conduct, may be a ground for departure in extraordinary cases").

E.    The totality of the circumstances is a basis for downward departure. The defendant submits that should this Court find that each of the aforestated factors is inadequate to warrant departure when taken in isolation, they suffice in combination to remove this case from the heartland. See United States v. Grandmaison, 77 F/3d 555,563 (1st Cir. 1996) utilizing the totality of the circumstances approach to making a aberrant behavior determinations. See United States v. Sklar, 920 F2.d 107, 117 (1st Cir. 1990), utilizing the totality of the circumstances approach to making determination whether a defendant's rehabilitative progress warrants departure ("Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."). See United States v. Fulton, 960 F. Supp. 479


(D. Mass. 1997), finding that a combination of separate kinds of circumstances warranted a downward departure. See <u>United States v. Ribot</u>, 97 F.Supp.2d 74 (D. Mass. 1999) (Downward departure based on a combination of aberrant behavior and mental illness). See <u>Commonwealth v. Coleman</u>, 188 F.3d 354, 360 (6th Cir. 1999), holding that a downward departure may be based on an aggregation of factors, each of which might in itself be insufficient to justify departure.

F.    <u>Extent of Departure</u>

This Court possesses the factual and legal basis to grant a downward departure, and, as has been long recognized, the sentencing court is in the best position to determine the extent of the departure based upon its peculiar "feel" for the case. See <u>United States v. Diaz-Villafane</u>, 874 F.2d 43 (1st Cir. 1989). See <u>United States v. Sayers</u>, 919 F.2d 1321, 1324 (8th Cir. 1990) ("The highly situation-specific nature of the Guideline factors suggests that appellate courts should accord great deference to ensuring district court determinations—both with respect to the threshold decision to impose a sentence below the Guidelines in the first instance, as well as the district court's determination of the extent of the departure warranted").

Thus, for example, the extent of the departure should reflect the extent to which reduced mental capacity contributed to the commission of the offense, see <u>United States v. Glick</u>, 946 F.2d 335, 339 (4th Cir. 1991), should also reflect the defendant's extraordinary rehabilitation, and should be

allowed to the extent that it will enable the defendant to continue his therapy. See United States v. Shore, supra at 84. The extent of the departure should also reflect the defendant's extraordinary vulnerability to abuse in prison, his tragic family history, and the combination of factors present in this case which warrant a downward departure.

Assuming, arguendo, the accuracy of the PSR, the defendant's total offense level is 23 with a criminal history category of I. The defendant submits that a departure of 13 levels, would enable this Court to impose a sentence of probation, a result which would be consistent with the interests of securing the defendant's rehabilitation and other purposes of sentencing. Should this Court find that the presentence report inaccurately computed the defendant's total offense level, the defendant submits that this Court should nonetheless depart to level 10 so as to enable the Court to impose a term of probation that includes a condition or combination of conditions that substitute home detention for imprisonment.

Respectfully submitted,

CHRISTOPHER LOGRASSO
By his attorney:

Steven J. Rappaport
Rappaport & Delaney
228 Central Street
Lowell, MA 01852
(978) 454-8103
BBO# 412300